## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**JACK DEBOER,**

      **Plaintiff,**

      **v.**                                **Case No.  06-2285-JWL**

**AMERICAN APPRAISAL**
**ASSOCIATES, INC.,**

      **Defendant.**

---

## MEMORANDUM AND ORDER

In this lawsuit, plaintiff Jack DeBoer alleges that defendant American Appraisal Associates, Inc. negligently and fraudulently appraised the value of a business entity known as Brackett, Inc.  Mr. DeBoer alleges that he relied on this appraisal to guarantee one of Brackett's debts before Brackett later declared bankruptcy.  This matter is currently before the court on American Appraisal's Motion for Summary Judgment (doc. #41).  For the reasons explained below, the court rejects American Appraisal's argument that it did not owe Mr. DeBoer a duty of care.  But, the court will nevertheless grant the motion on the grounds that no rational trier of fact could find that Mr. DeBoer's reliance on the appraisal was reasonable and justifiable.

## STATEMENT OF MATERIAL FACTS[1]

American Appraisal is an international appraisal company which provides services that evaluate commercial, industrial, and institutional properties.  American Appraisal offers commercial and institutional appraisal services to evaluate the value of real estate, personal property, and intellectual property.  Mr. DeBoer is a graduate of Michigan State University with a degree in business and accounting.  He has been a businessman since 1954.  He is primarily involved in real estate development, and he has also been involved in the manufacturing, insurance, and airline industries.

In July of 1990, American Appraisal performed an appraisal for Brackett, a business in Topeka, Kansas.  At that time, Brackett manufactured a number of machines used to bind and create pads for office supplies.  As a result of Brackett's manufacturing business, it had accumulated over twenty thousand product drawings drafted by engineers.  The 1990 work performed by American Appraisal for Brackett consisted of three appraisals: a fair market value in continued use (FMV-CU) appraisal; an orderly liquidation value (OLV) appraisal; and an insurance appraisal.  An FMV-CU appraisal establishes value on the premise of the continued use of the assets in the business.  It assumes that the buyer and seller would be contemplating retention of the assets at their present location as part of the current operations.  This type of appraisal does not represent the amount that might be realized from the

---

[1] Consistent with the well established standard for evaluating a motion for summary judgment, the following facts are either uncontroverted or stated in the light most favorable to plaintiff, the nonmoving party.

piecemeal disposition of the assets in the marketplace or from an alternative use of the assets, such as at an auction.  By contrast, an OLV appraisal measures the value of the assets when they are taken out of the company and sold outside of the business to alternate users.  An insurance appraisal establishes the cost of replacing the assets.  American Appraisal's 1990 appraisals estimated the value of Brackett's engineering drawings, its most prominent asset, as follows: $1,015,000 on the FMV-CU appraisal; $0 on the OLV appraisal; and $0 on the insurance appraisal.

On February 22, 2003, Michael Murray, President of Brackett, emailed American Appraisal's sales representative and indicated that Brackett was attempting to obtain financing for its business.  Mr. Murray also informed American Appraisal that he had previously obtained from American Appraisal appraisals in 1990 that consisted of FMV-CU, OLV, and insurance appraisals.  This time, however, Mr. Murray requested that American Appraisal only perform an FMV-CU appraisal, not an OLV or insurance appraisal.[2]  Kenneth Peterson with American Appraisal asked Mr. Murray why he wanted an FMV-CU appraisal because it was unusual to use an FMV-CU appraisal for bank financing.  Mr. Peterson knew that a FMV-CU appraisal would be a higher value than what would be realized by an asset liquidation.  Mr. Murray responded that the parties involved (himself and the bank) were aware of that and to go with the FMV-CU appraisal anyway.

---

[2] They also negotiated an additional $900 fee for an insurance report, but Mr. Murray ultimately decided not to pursue that appraisal.

American Appraisal conducted an FMV-CU appraisal for Brackett, and provided the

appraisal to Brackett.  The key terms of that appraisal are as follows:

> We made this investigation to express an opinion as of March 1, 2003, of the fair market value of the assets on the premise of continued use, under the assumption earnings will be adequate to justify ownership of the assets appraised.  It was understood that this opinion would provide a basis for financing.
>
> Fair market value in continued use is not commonly accepted by the lending community as appropriate collateral value to support financing arrangements.  Our inclusion of this value premise in this report does not represent an endorsement for such use.
>
> *Fair market value* is defined as the estimated amount at which the assets might be expected to exchange between a willing buyer and a willing seller, neither being under compulsion, each having reasonable knowledge of all relevant facts.
>
> When fair market value is established on the premise of *continued use*, it is assumed that the buyer and the seller would be contemplating retention of the assets at their present location as part of the current operations.  An estimate of fair market value arrived at on the premise of continued use does not represent the amount that might be realized from piecemeal disposition of the assets in the marketplace or from an alternative use of the assets. . . .
>
> . . . .
>
> We did not investigate any financial data pertaining to the present or prospective earning capacity of the operation in which the designated assets are used.  It was assumed that prospective earnings would provide a reasonable return on the appraised value of the designated assets, plus the value of any assets not included in the appraisal, and adequate net working capital.  If prospective earnings are not adequate to justify ownership of the assets at the appraised levels, then the concluded fair market value as reported here must be reduced accordingly.
>
> . . . .
>
> Accordingly, based on the premise of continued use and under the assumption earnings will be adequate to justify ownership of the assets appraised, it is our opinion that, as of March 1, 2003, the fair market value of the designated assets is reasonably represented in the amount of ONE MILLION THREE HUNDRED FORTY-FIVE THOUSAND ONE HUNDRED DOLLARS ($1,345,100) . . . .

> As indicated earlier, the above fair market value does not represent the amount that might be realized from piecemeal disposition of the assets in the open market or from their use for an alternative purpose.
> . . . .
> Our report is to be used only for the specific purposes stated herein and any other use is invalid.  No reliance may be made by any third party without our prior written consent.  You may show our report in its entirety to those third parties who need to review the information contained herein.  No one should rely on our report as a substitute for their own due diligence.  No reference to our name or our report, in whole or in part, in any document you prepare and/or distribute to third parties may be made without our written consent.

Of the appraised value of $1,345,100, Exhibit B to the appraisal sets forth a value of $785,000 (Fair Market Value - Continued Use) for the engineering plans and product drawings, and lists this value with the notation "INFORMATION PER CLIENT."

Mr. DeBoer has known Mr. Murray for over twenty years.  He had been asked, from time to time during informal business association forums, to provide his input as to Brackett's business concerns, including cash flow and financing difficulties.  After Mr. Murray discussed some of these difficulties with Mr. DeBoer in December 2002 and early 2003, Mr. Murray explained to Mr. DeBoer that he needed to obtain a loan for Brackett and he requested that Mr. DeBoer provide a guarantee so that Brackett could obtain the loan.  Mr. Murray initially asked Mr. DeBoer to guarantee the difference between an SBA loan and a bank loan, but Mr. DeBoer offered to guarantee the bank loan.  On May 27, 2003, Mr. DeBoer guaranteed Brackett's loans to Kaw Valley State Bank in Topeka for a sum of up to $595,000.

Mr. DeBoer testified in his deposition that prior to executing the guaranty he did not perform due diligence "in the way I would in a business that I was buying or investing in." Instead, he "relied on what Mike [Murray] told [him] at that point." According to Mr. DeBoer, Mr. Murray told Mr. DeBoer that Mr. Murray "had an appraisal from American Appraisal . . . and that that appraisal was fairly current and appraised the value of the business at I think a million three or some such number." Mr. DeBoer stated that he relied on the appraisal information first and foremost because he knew of the appraisal company, as he himself had used American Appraisal before. The parties stipulated in the pretrial order that before Mr. DeBoer executed the guaranty he did not see or read the 2003 appraisal by American Appraisal. He also did not perform any independent investigation of Brackett's financial condition and he did not ask anyone else to look into Brackett for him. He testified that he considered three factors in deciding to guaranty the loan: (1) Mr. Murray's statement to Mr. DeBoer that Brackett had $800,000 of good, profitable sales booked; (2) Mr. Murray's statement that Brackett's parts sales were about $80,000 per month; and (3) Mr. Murray's statement that he had an appraisal from American Appraisal that "appraised the value of the business I think at a million three or some such number." Mr. DeBoer believed that the appraised value given by American Appraisal meant that "if everything went upside down this is what the company was worth" and that "was enough for [him]" and he signed the guaranty. Mr. DeBoer never contacted American Appraisal about the appraisal or obtained American Appraisal's consent to rely on it.

Aside from Mr. Murray's oral representation concerning the appraisal, the other representation Mr. DeBoer received prior to executing the guaranty was also given to him by Mr. Murray, this time in the form of a Brackett Advisory Board Agenda dated May 21, 2003. Mr. DeBoer testified in his deposition that he "probably" looked at this document when it was given to him at or before the advisory board meeting.[3] The agenda listed a "Fair Market Value - Continued Use (Evaluation)" of $1,450,445. It also included a "Fixed Asset" list that showed values (among others) for engineering drawings of $785,000 and shop machinery of $525,100. Mr. DeBoer had also received a prior document which reflected some of the values set forth in the 1990 appraisals.[4]

On July 12, 2004, Brackett filed a voluntary petition for Chapter 11 bankruptcy protection. On April 12, 2005, Mr. Murray and his wife filed for Chapter 7 bankruptcy. Mr. DeBoer filed an action against Mr. Murray in the bankruptcy proceeding alleging, among other things, that Mr. Murray had made fraudulent statements to Mr. DeBoer about the financial stability, level of accounts receivables, sales figures, inventory values, and other relevant matters concerning Brackett, and that Mr. DeBoer executed the guaranty in reliance

---

[3] The agenda lists the advisory committee board meeting date as May 21, 2003, and Mr. DeBoer guaranteed the loan on May 27, 2003.

[4] There is no suggestion in the record that Mr. DeBoer's claims are based on the values set forth in the 1990 appraisals. Instead, the values included in the 1990 appraisals are arguably relevant to understanding how American Appraisal arrived at some of the values contained in the 2003 appraisal. At this procedural juncture, however, the manner in which American Appraisal allegedly performed the appraisal (i.e., negligently) is not particularly relevant to the grounds upon which American Appraisal is seeking summary judgment.

7

on these oral statements.  As a result of Mr. DeBoer's guaranty and Brackett's default on the bank loan, on October 20, 2006, Mr. DeBoer was required to sign and/or guarantee a promissory note to Kaw Valley State Bank for the sum of $692,043.  Mr. DeBoer's indebtedness to Kaw Valley State Bank is being reduced to the extent that Brackett is making payments pursuant to the order confirming Brackett's plan of reorganization.

Plaintiff's statement of facts consists of several additional pages of facts from which a rational trier of fact, viewing the evidence in the light most favorable to plaintiff, could find that the appraisal was a rush job which deviated from professional appraisal standards, that American Appraisal did not inspect the assets and significantly overvalued them (especially the engineering drawings, which were Brackett's single largest asset), and that Brackett actually had a FMV-CU of $138,500, which was less than eleven percent of American Appraisal's appraised value.  Consequently, the court accepts those facts as true for purposes of resolving American Appraisal's motion for summary judgment.

As American Appraisal points out, however, its motion for summary judgment is not directed to the issue of whether it performed the appraisal negligently or fraudulently, but rather to the issues of whether it owed a duty to Mr. DeBoer and whether Mr. DeBoer's alleged reliance on the appraisal was justifiable.  In that sense, American Appraisal's motion is directed to the fact that American Appraisal performed the work for Brackett, not for Mr. DeBoer, and that Mr. DeBoer did not actually rely on the appraisal itself.  In response, Mr. DeBoer points out that he served on Brackett's advisory board of directors.  Additionally, deposition testimony establishes that American Appraisal knew from the appraisal's

8

inception that Mr. Murray intended to use the appraisal for financing, even though this type of appraisal was atypical for financing purposes.

Based on these facts, American Appraisal now seeks summary judgment on Mr. DeBoer's claims against it for negligent misrepresentation and fraudulent misrepresentation. American Appraisal argues, first, that Mr. DeBoer's negligent misrepresentation claim fails as a matter of law because American Appraisal owed no legal duty to him. Second, American Appraisal argues that it is entitled to summary judgment on both of Mr. DeBoer's claims because he did not justifiably rely on the appraisal.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Wright ex rel. Trust Co. v. Abbott Labs., Inc*., 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670 (10th Cir. 1998)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler*, 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Spaulding*, 279 F.3d at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see also Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324. The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256; *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001). Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Mitchell v. City of Moore*, 218 F.3d 1190, 1197-98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671). To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Adams,* 233 F.3d at 1246.

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed 'to secure the just, speedy and

inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## ANALYSIS

For the reasons explained below, the court rejects American Appraisal's argument that it did not owe a duty of care to Mr. DeBoer.  But, the court will nonetheless grant American Appraisal's motion on the grounds that the summary judgment record does not reflect a genuine issue of fact sufficient to support his fraud claim.  Mr. DeBoer relied on misrepresentations by Mr. Murray concerning the appraisal, which means that he could only plausibly bring his claims on an indirect reliance theory.  The indirect reliance theory does not permit Mr. DeBoer to fare any better than if he had relied on the appraisal itself, and no rational trier of fact could find that Mr. DeBoer could have reasonably and justifiably relied on the appraisal in light of its various assumptions, limitations, and disclaimers.

## A.    <u>Lack of a Duty on Negligent Misrepresentation Claim</u>

American Appraisal contends, first, that the court should grant summary judgment on Mr. DeBoer's negligent misrepresentation claim because American Appraisal owed no duty to Mr. DeBoer with regard to the appraisal.  In support of this argument, American Appraisal relies on *Zanata Realty, Inc. v. Williams*, 935 So.2d 1163, 1167 (Ala. 2005), and *Zielinski v. Prof'l Appraisal Assoc.*, 740 A.2d 1131 (N.J. Super. Ct. App. Div. 1999), which was relied on by another judge in this district in *U.S. ex rel. Pro Controls Corp. v. Conectiv Servs., Inc.*, Case No. 00-4024-JAR, 2002 WL 1758907, at *3 (D. Kan. July 9, 2002).  Defendant's

reliance on these cases is misplaced because none of them involved the application of Kansas law. *Zanata Realty* is a case decided under Alabama law and in *U.S. ex rel. Pro Controls Corp.* the court was applying New Jersey law, hence the reference to *Zielinski*. Kansas law governs the parties' claims in this case. *See* Pretrial Order (doc. #35), ¶ 3(d), at 2.

The Kansas Supreme Court has adopted the tort of negligent misrepresentation as defined in the Restatement (Second) of Torts § 552 (1976). *Wilkinson v. Shoney's, Inc.*, 269 Kan. 194, 218, 4 P.3d 1149, 1165 (2000); *Mahler v. Keenan Real Estate, Inc.*, 255 Kan. 593, 604-05, 876 P.2d 609, 616 (1994). Under the principles set forth in § 552, the tort of negligent misrepresentation generally applies to the negligent supply of commercial information to others for guidance in their commercial and business transactions. *Bittel v. Farm Credit Servs.*, 265 Kan. 651, 664, 962 P.2d 491, 500 (1998); *Gerhardt v. Harris*, 261 Kan. 1007, 1018, 934 P.2d 976, 984 (1997) (citing the examples set forth in the comments to § 552 such as negligent audits furnished by relying parties in a financial transaction, negligent engineer reports relied on by contractors bidding for construction work, and negligent land surveys relied on by parties to real estate contracts). Specifically, the Restatement states that liability is limited to loss suffered

> (a) by the person or one of a limited group of persons for whose benefit and guidance he [or she] intends to supply the information **or knows that the recipient intends to supply it**; and
> (b) through reliance upon it in a transaction that he [or she] intends the information to influence **or knows that the recipient so intends** or in a substantially similar transaction.

§ 552(2) (emphasis added).

12

Here, deposition testimony included in the summary judgment record establishes that American Appraisal knew from the appraisal's inception that Mr. Murray intended to use the appraisal for financing, even though this type of appraisal was not commonly used for financing purposes. Indeed, the first page of the appraisal states that "[i]t was understood that this opinion would provide a basis for financing." Even though the appraisal states that fair market value in continued use is not commonly accepted as appropriate collateral value to support financing arrangements and that American Appraisal's inclusion of that value did not represent an endorsement for such use, it is clear that American appraisal knew that Brackett (the recipient) intended to supply the appraisal to financing sources to use in securing financing. Thus, it was foreseeable from American Appraisal's perspective that Brackett would share the information contained in the appraisal with financing sources. Mr. DeBoer, a prospective guarantor to whom Mr. Murray supplied information from the appraisal, is within the scope of those to whom American Appraisal owed a duty of care. Accordingly, the court rejects American Appraisal's argument that it owed no duty of care to Mr. DeBoer.

**B.     Justifiable Reliance**

American Appraisal also argues that the court should grant summary judgment on both of Mr. DeBoer's claims (fraudulent misrepresentation and negligent misrepresentation) because Mr. DeBoer did not justifiably rely on the appraisal. The elements of both fraudulent misrepresentation and negligent misrepresentation include, among other things, an untrue statement and the plaintiff's justifiable reliance on the truth of that statement. *Doe*

13

*v. Kan. Dep't of Human Res.*, 277 Kan. 795, 801-02, 90 P.3d 940, 946-47 (2004) (fraud); *Mahler*, 255 Kan. at 604, 876 P.2d at 604 (negligent misrepresentation). The court's analysis of the justifiable reliance element in this case is somewhat unusual in light of the nature of the misrepresentation at issue. This is not a typical case in which Mr. DeBoer is claiming that he relied on a misrepresentation made to him by American Appraisal itself. It is uncontroverted that he never saw the appraisal before he executed the guarantee. Instead, he relied on Mr. Murray's representations concerning the appraisal. These included Mr. Murray's oral statement to Mr. DeBoer that Mr. Murray had a fairly current appraisal from American Appraisal which appraised the value of Brackett at "a million three or some such number" as well as the values set forth in the Advisory Board Agenda dated May 21, 2003, which also was given to Mr. DeBoer by Mr. Murray. Mr. DeBoer is seeking to recover from American Appraisal, then, on the basis of an alleged misrepresentation that American Appraisal made to a third party (Brackett and Mr. Murray) rather than to Mr. DeBoer himself. As such, this case falls within the rubric of what is called an "indirect reliance" theory.

Kansas courts have held that a plaintiff may recover for fraudulent misrepresentation where reliance occurs indirectly. For example, in *Griffith v. Byers Constr. Co.*, 212 Kan. 65, 510 P.2d 198 (1973), the Kansas Supreme Court held that the plaintiff homeowners, who had purchased their home lots, could bring an action for fraudulent concealment of a soil defect against the developer directly even though in purchasing the lots the homeowners had never dealt with the developer. In *Citizens State Bank v. Gilmore*, 226 Kan. 662, 603 P.2d 605

14

(1979), a bank which had made a loan to the buyer of cattle brought a fraud claim directly against the cattle sellers based on allegations that the cattle were known to be diseased at the time of sale.  The Kansas Supreme Court held that the bank fell squarely within the rule of the Restatement (Second) of Torts §§ 531 and 533 in that it was within the class of persons the sellers had reason to expect would act in reliance on the seller's concealment of the fact that the cattle were diseased.  *Id.* at 670-71, 603 P.2d at 612.  And, in *Tetuan v. A.H. Robins Co.*, 241 Kan. 441, 738 P.2d 1210 (1987), the Kansas Supreme Court upheld a verdict finding the manufacturer of the plaintiff's prescription intrauterine device to be liable on the basis that the manufacturer had fraudulently misrepresented and/or concealed the danger of the device to her doctor.  Although each of these cases were fraudulent concealment cases, the Kansas Supreme Court relied on the principles applicable in situations involving affirmative misrepresentations.  *See Citizens State Bank*, 226 Kan. 671, 603 P.2d at 612 ("The fact that the misrepresentation consisted of a concealment of material facts rather than a material misstatement of facts does not alter the situation."); *Griffith*, 212 Kan. at 72, 510 P.2d at 204 ("No reason appears why this same rule should not be applicable to nondisclosures as well as misrepresentations." (quotation omitted)).  Conversely, then, this reasoning applies with equal force in cases involving affirmative misrepresentations. Accordingly, it is clear that under Kansas law a third party may have an action for fraud without any direct contact with and without having received any direct misrepresentations from the defrauding party.  *Citizens State Bank*, 226 Kan. at 668, 603 P.2d at 610.

Just because an indirect reliance theory is available to Mr. DeBoer, however, does not mean that he can benefit from this theory in the way he seeks to do so. The fallacy in his logic is that he seeks to rely on the pared down version of the appraisal that he received from Mr. Murray, not the appraisal itself. Mr. Murray conveyed to Mr. DeBoer only the aspects of the appraisal which were beneficial to him (that Brackett was worth $1.3 million and that the engineering drawings were worth $785,000) without telling Mr. DeBoer about all of the appraisal's assumptions, limitations, and disclaimers. Thus, Mr. DeBoer is essentially seeking to improve his position by avoiding the impact of the contents of the appraisal itself. This theory finds no support in Kansas law.

The plaintiffs in *Griffith*, *Citizens State Bank*, and *Tetuan* did not fare any better than if they had brought their claims under a direct reliance theory. In those cases, all of which were concealment cases, the intermediate third persons essentially "repeated" the defendants' omissions by making identical omissions to the plaintiffs. Consequently, the plaintiffs' reliance in those cases was justifiable to the same extent as if they had received the original omission. Indeed, those cases derive from the principles set forth in the section of the Restatement entitled "Representation Made to a Third Person," which states as follows:

> The maker of a **fraudulent misrepresentation** is subject to liability for pecuniary loss to another who acts in **justifiable reliance <u>upon it</u>** if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved.

16

§ 533 (emphasis added).  The "upon it" refers to the fraudulent misrepresentation itself.

Thus, a person seeking to recover under an indirect reliance theory must demonstrate that his

or her reliance on the original fraudulent misrepresentation would have been justifiable.

Consequently, the court rejects Mr. DeBoer's arguments to the effect that his reliance on Mr.

Murray's misrepresentations was justifiable.  Mr. DeBoer is not entitled to improve how he

fares in his claim against American Appraisal by basing his claim on the version of the

appraisal presented to him by Mr. Murray and avoiding the question of whether any reliance

by him on the appraisal itself, which is the only representation made by American Appraisal,

would have been justifiable.

Turning to that question, then, under Kansas law a plaintiff's reliance on a

misrepresentation must be reasonable, justifiable, and detrimental.  *Tetuan*, 241 Kan. at 467,

738 P.2d at 1230; *Slaymaker v. Westgate State Bank*, 241 Kan. 525, 531, 739 P.2d 444, 450

(1987); *see also Wilson v. Meeks*, 98 F.3d 1247, 1254 (10th Cir. 1996) (applying Kansas

law).  In this case, the court finds as a matter of law that no rational trier of fact could find

that Mr. DeBoer could have reasonably relied on the appraisal to justify his decision to

guarantee Brackett's loan.  Although the appraisal stated that "[i]t was understood that this

opinion would provide a basis for financing," it explained in the following two sentences that

an FMV-CU appraisal is generally unacceptable to support financing arrangements and that

American Appraisal's inclusion of that value was not "an endorsement for such use."  These

statements alone would have served as a "danger signal and a red light" to any normal

financier.  *See Goff v. Am. Sav. Ass'n*, 1 Kan. App. 2d 75, 81-82, 561 P.2d 897, 903 (1977)

17

(trial court did not err in granting summary based on no reasonable reliance where plaintiffs had actual knowledge of facts that were contrary to the misrepresentation that they allegedly relied on).  As if that were not enough, the appraisal contained reasons that revealed why it would, by its very nature as an FMV-CU appraisal, be inappropriate to support financing arrangements.   The appraisal stated twice—once at the top of page two and again immediately following the appraised value, neither of which were buried in obscure fine print—that the appraised value based on FMV-CU did not represent the amount that might be realized for piecemeal disposition of the assets in the marketplace or from an alternative use of the assets.  Evidencing the unreasonableness of relying on this type of appraisal as a basis for financing, Mr. DeBoer testified in his deposition that he believed the appraised value conveyed to him by Mr. Murray meant that if Brackett "had everything go upside down, this is what the company was worth."  This, of course, is directly contrary to what is stated in the appraisal.  In fact, the appraisal explains that it was based on the assumption that earnings would be adequate to justify ownership of the assets appraised, that American Appraisal did not investigate any financial data pertaining to the earning capacity of the operation but instead assumed adequate prospective earnings, and that the value would have to be reduced if Brackett's earnings dropped.  Additionally, the stated value of Brackett's single biggest asset, its engineering drawings, was listed as "INFORMATION PER CLIENT."  And, the generic terms of the appraisal state that "[n]o one should rely on our report as a substitute for their own due diligence."  In sum, the appraisal was so laden with qualifications and disclaimers that no reasonable financier would have accepted it as

appropriate to support a $595,000 loan guarantee without conducting any further investigation. Under the facts and circumstances presented here, the court has no difficulty concluding that no rational trier of fact could find that Mr. DeBoer's reliance on the appraisal would have been reasonable or justifiable. *Cf. Schnellmann v. Roettger*, 627 S.E.2d 742, 744-45 (S.C. Ct. App. 2006) (reliance on representation concerning square footage of home was unreasonable where MLS listing contained disclaimer concerning the measurement and buyers had the opportunity to inspect the home for square footage prior to closing); *Zielinski v. Prof'l Appraisal Assoc.*, 740 A.2d 1131 (N.J. Super. App. Div. 1999) (plaintiff's reliance on the fact that her mortgage was approved to mean that the appraiser had found the property to be free of structural defects was unreasonable where, if the plaintiff had seen the appraisal itself she would have seen the disclaimer concerning property conditions).

**IT IS THEREFORE ORDERED BY THE COURT** that American Appraisal Associates, Inc.'s Motion for Summary Judgment (doc. #41) is granted. This case is dismissed.

**IT IS SO ORDERED** this 17th day of August, 2007.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

19